**BENCHMARK RESOURCES CORPORATION, a Colorado Corporation; Gentry Corporation, a Colorado Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 03–178L.**

United States Court of Federal Claims.

March 17, 2005.

---

James N. MacKinlay, Phoenix, AZ, for plaintiffs. Howard M. Shanker, The Shanker Law Firm, Brian R. Warnock, Warnock, MacKinlay & Associates, P.L.L.C., of counsel.

Elsie B. Kappler, Washington, DC, with whom was Assistant Attorney General Thomas L. Sansonetti, for defendant. Daniel W. Kilduff, Office of the Solicitor, U.S. Department of the Interior, of counsel.

## *OPINION*

CHRISTINE ODELL COOK MILLER, Judge.

This case is before the court after transfer subsequent to completed briefing on defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). Defendant asserts that the property owners' claims are time-barred by 28 U.S.C. § 2501 (2000), for failure to file a complaint within the six-year statute of limitations. Argument has been held.

1. Cinste Energy, Inc., a non-party in this matter, conveyed its 37.5% of a 50% undivided interest in the whole property to Benchmark after the alleged taking occurred. Santiago Limited, an-

## FACTS

As defendant's motion to dismiss challenges the truth of the jurisdictional facts asserted in the complaint, the following facts are drawn from the parties' pleadings and evidentiary materials outside the pleadings.

Benchmark Resources Corporation ("Benchmark") and Gentry Corporation ("Gentry") (collectively "plaintiffs") are Colorado corporations that seek money damages based on the just compensation clause of the Fifth Amendment to the United States Constitution. Plaintiffs claim that a taking occurred when the Department of the Interior's Office of Surface Mining Reclamation and Enforcement (the "OSM") designated certain property in the Rock Creek Watershed of Hamilton and Bledsoe Counties in Tennessee (the "designated area") as unsuitable for surface mining.

The land at issue consists of approximately 7,000 acres of real property in fee simple, including all mineral rights, located in Bledsoe and Hamilton Counties, Tennessee, and all mineral rights associated with 24,000 acres of real property located in Bledsoe and Hamilton Counties, Tennessee (collectively, the "Property"). At the time of the alleged taking, Gentry was the owner of 25% of a 50% undivided interest in the whole Property. Comparatively, Benchmark owned 37.5% of a 50% undivided interest in the whole Property.[1]

Defendant asserts that the statute of limitations bars plaintiffs' claim. Because the parties contest the significance of critical dates with respect to plaintiffs' claim, a thorough examination of the critical dates in this matter therefore follows.

The Surface Mining and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201–1328 (2000), was enacted, in part, to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations" and to "assure that the rights of surface landowners and other persons with a legal interest in the land or appurtenances thereto are fully pro-

other non-party, held a pre-existing 50% interest in the same Property conveyed to plaintiffs and Cinste as tenants in common.

tected from such operations[.]" 30 U.S.C. § 1202(a), (b). SMRCA is administered by the OSM, *id.* § 1211(c), and it allows "[a]ny person having an interest which is or may be adversely affected" to file a petition requesting that an area be deemed "unsuitable for surface coal mining operations," *id.* § 1272(c). 30 C.F.R. § 762.11(a), (b) (2005), lists circumstances where the Secretary of the Interior either must or may designate an area as unsuitable for all or certain types of surface coal mining operations. Specifically, an area "shall be designated as unsuitable for all or certain types of surface coal mining operations, if the regulatory authority determines that reclamation is not technologically and economically feasible under the Act, this chapter, or an approved State program." 30 C.F.R. § 762.11(a).

On October 10, 1984, the Legal Environmental Assistance Foundation ("LEAF") filed an Unsuitability Petition (the "Petition") on behalf of several individuals with the OSM seeking to "designate an area lying within the Rock Creek Watershed as unsuitable for all surface coal mining operations" for the purposes of protecting the petitioners' water supply, preventing noise and environmental pollution from mining activities, and preventing a decrease in the scientific and aesthetic values of the land. The designated area consisted of approximately 22,858 acres on Walden's Ridge in Hamilton and Bledsoe Counties, Tennessee (the "Petition Area"). Plaintiffs allege that approximately two thirds of the Petition Area consists of the Property in which plaintiffs own a 50% undivided share. The OSM published a notice announcing receipt of the Petition and determination that it was complete in the December 13, 1984, and December 20, 1984 issues of the *Chattanooga Times* and in the December 20, 1984, and December 27, 1984 issues of the *Bledsonian Banner.*

Subsequent to these publications, on approximately December 26, 1984, the OSM sent notice of the filing of the Petition via letter to the LEAF petitioners and to potentially affected owners. This letter was sent to land owners who appeared on an attached mailing list of names and addresses. Despite the fact that their deed for the Property was recorded properly, plaintiffs' names did not appear on this list, and plaintiffs assert that they did not receive a copy of this mailing. Included in this mailing was a form to request a copy of the Petition.

Although plaintiffs themselves did not receive a copy of the December 26, 1984 letter giving notice of the Petition, MTB Holding Corp. ("MTB"), in care of attorney Joseph G. Bagwell,[2] did receive such a letter.[3] According to plaintiffs, MTB was a prior owner in the Property. Affidavit of Darold Proctor, June 23, 2004, ¶ 5. Other than this minimal connection, MTB is a separate corporate identity unrelated to plaintiffs.

In early February 1985, Darold E. Proctor, president of Benchmark, learned that the Petition had been filed.[4] In order to ascertain the Petition's possible effect on the Property, Mr. Proctor completed and mailed the OSM form that was included with the

---

2. The capacity in which Mr. Bagwell acted for plaintiffs with respect to the Property is a matter of contention between the parties. Plaintiffs assert that Mr. Bagwell's scope of authority was limited to collecting timber lease payments and applying them to pay property taxes. Affidavit of Darold Proctor, June 23, 2004, ¶ 7. While plaintiffs claim that Mr. Bagwell was not authorized to accept service of the December 26, 1984 letter on their behalf, defendant contends that, under Tennessee law, Mr. Bagwell was plaintiffs' agent because of the actions that he took on behalf of plaintiffs with respect to the Property.

3. Defendant claims that Mr. Bagwell's name appeared in the tax records as the agent for MTB and that MTB was listed by the tax authorities during the time in question as the owner of plaintiffs' Property.

4. Some dispute, although minimally influential to the outcome of this motion, remains as to how Mr. Proctor became aware of the Petition. Mr. Proctor's deposition testimony indicates that Benchmark's in-house counsel, Karl Farr, provided Mr. Proctor with the form that had been mailed with the December 26, 1984 OSM letter, although Mr. Proctor is unaware as to how Mr. Farr obtained the form. Deposition of Darold E. Proctor, Oct. 10.2003, at 67–68. On the other hand, defendant, in an attempt to further its agency argument, contends that Mr. Bagwell forwarded the OSM notice to plaintiffs on approximately December 31, 1984. *See* Deposition of Joseph G. Bagwell, Jan. 16, 2004, at 46–50.

December 26, 1984 letter and requested a copy of the Petition. The OSM received this form on February 4, 1985, and a handwritten note on the received form indicates that Mr. Proctor was mailed a copy of the Petition and amended Petition on February 5, 1985. Presumably, these copies were mailed to the address provided by Mr. Proctor on the form: 3314 N. 41st Street, Phoenix, Arizona, 85018. This address was also handwritten on the envelope in which Mr. Proctor mailed the form, overriding Benchmark's typewritten return address. Mr. Proctor testified at deposition that plaintiffs never received a copy of the Petition or amended Petition in response to this completed form. Deposition of Darold E. Proctor, Oct. 10, 2003, at 72.

After not receiving a response from the OSM to the February 1985 request, Mr. Proctor on August 11, 1985, again wrote the OSM requesting information about the Petition. A notation on this letter indicates that the OSM received it on August 16, 1985. No return address was included on the letter, and Benchmark's return address on the envelope had been crossed out.[5] When plaintiffs did not receive a response to this letter, they assumed, much to their detriment, that their Property interest would not be affected by the pending Petition.

By defendant's account, further events served as opportunities that should constitute notice with regard to the Petition and the possibility that action would be taken to affect their interests in the Property. On December 10, 1985, the OSM published in the Federal Register notice of its intent to prepare a combined draft unsuitability petition evaluation document/environmental impact statement ("PED/EIS"). 50 Fed.Reg. 50,351 (Dec. 10, 1985). On March 24, 1986, the OSM published notice in the Federal Regis-

ter of the availability of the Draft PED/EIS. 51 Fed.Reg. 10,119 (Mar. 24, 1986). Notice of availability of the Draft PED/EIS was sent to interested parties.[6] Defendant emphasizes that, based on the set of mailing labels used for the distribution of the Draft PED/EIS notice, while plaintiffs were not on the list, Mr. Bagwell received at least three copies of the notice-one in his capacity as agent for MTB and two in his capacity as agent for Santiago Limited. On September 26, 1986, the OSM sent interested parties notice of the Final PED/EIS. Again, defendant emphasizes that since the same mailing labels were used for the Final PED/EIS as had been used for the Draft PED/EIS, Mr. Bagwell received at least three copies of the notice. Notice of the Final PED/EIS was also published in the Federal Register. 51 Fed.Reg. 35,570 (Oct. 6, 1986).

Finally, on March 24, 1987, the OSM issued a Decision on the Petition, whereby it designated certain property within the Petition Area as unsuitable for surface coal mining operations. This included designating "[a]ll surface minable reserves of the Sewanee seam within the Rock Creek watershed, Tennessee as unsuitable for coal mining operations using conventional overburden mixing techniques for reclamation" and the "Hall, Middle, and Rock Creek gorges as unsuitable for all surface coal mining operations and surface disturbance incident to underground mining." Decision, Office of Surface Mining Reclamation and Enforcement, Mar. 24, 1987. Notice of the Decision was published in the Federal Register. 52 Fed. Reg. 10,174 (Mar. 30, 1987). On April 2, 1987, the OSM sent a letter enclosing the Decision to interested parties. According to Douglas K. Siddell, currently the Supervisor of the Technical Group of the Knoxville Field

---

5. Throughout the trail of mailings from the OSM, plaintiffs point to the mailing lists used by the OSM and the fact that no mailing list includes plaintiffs' names or addresses. Douglas K. Siddell, currently the Supervisor of the Technical Group of the Knoxville Field Office of the OSM, testified that he was not aware of any lists used for Petition mailings that contained the names of Benchmark, Gentry, or Cinste. Deposition of Doug Siddell, Mar. 25, 2004, at 67–68. Interestingly, Mr. Siddell testified that "when someone asks to be put on our mailing list to get notified,"

the OSM puts them on the list, *id.* at 20, and he was "not ... able to determine why [plaintiffs are] not on the lists based on [his] review of the file[,]" *id.* at 68. Plaintiffs contend that their February and August 1985 communications with the OSM should have placed them on this list.

6. Defendant does not contend that plaintiffs are not interested parties. The size of the Property, in combination with the magnitude of its possible value, rendered plaintiffs very interested parties.

Office of the OSM, no mailing list was retained in the OSM's file for the final Decision. Declaration of Douglas K. Siddell, May 25, 2004, ¶ 13. Mr. Siddell assumes that the same list was used for the Decision mailing as was used for prior mailings, *id.,* and defendant further assumes that Mr. Bagwell again was sent at least three copies of the mailing that included the Decision. Mr. Siddell has testified that he was unaware of any record maintained by the OSM that plaintiffs received notice of the Decision through either certified mail, regular mail, or personal service. Deposition of Doug Siddell, Mar. 25, 2004, at 113–14. As Mr. Siddell stated that the files for unsuitability petitions "are organized according to regulatorily-defined milestones associated with the filing with OSM of a lands unsuitability petition[,]" Siddell Decl. ¶ 5, and, as those milestones include the Petition, the Draft PED/EIS, the Final PED/EIS, and the Decision, Siddell Dep. at 91, it is apparent that the OSM's files were not complete with regard to the Petition.

On March 7, 2000, Mr. Proctor, on behalf of plaintiffs, wrote the OSM requesting permits to mine the Property. On March 30, 2000, the OSM responded to plaintiffs' request by letter and enclosed a copy of the OSM's March 24, 1987 Decision in the response. Plaintiffs claim that this was the first instance in which they were aware of the OSM's Decision designating their Property as unsuitable for surface mining.

The prospective damage to plaintiffs as a result of the OSM's Decision is potentially devastating. Based on a January 10, 1982 evaluation by Mineral Associates, Inc., plaintiffs estimate that the Property consists of approximately 142,153,300 tons of strippable coal deposits, 84,638,500 tons of which would be recoverable under normal conditions. The coal is high rank sub-bituminous "Type A" coal that has a high heating value and low sulfur and ash content, and the value of this coal at the time of the evaluation was be-

tween $27.00 and $45.00 per ton, with an average value of $35.00 per ton. Allowing for mining costs of $17.00 to $20.00 per ton, plaintiffs estimate a pre-tax profit of $7.00 to $10.00 per ton. At the $10.00 per ton value, the coal reserves on the Property were worth approximately $846,385,000.00 at the time of the alleged taking.[7] *See* Pl.'s Br. filed June 25, 2004, at 12. The OSM's Decision renders plaintiffs unable to mine their land, nor can they recover any portion of this value.

Plaintiffs' overarching claim is that they were not compensated properly for the taking of their Property contrary to the just compensation clause of the Fifth Amendment. The matter before this court addresses defendant's motion that plaintiffs did not file their claim within the six-year statutory time period. Plaintiffs rejoin that they did not receive notice of the OSM's Decision until March 30, 2000, so that the filing of their claim on January 24, 2003, comes within the six-year period.[8]

## DISCUSSION

### I. *Standards*

#### 1. *Jurisdiction*

The Tucker Act guides the jurisdictional reach of the United States Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(1) (2000). Specifically, the Tucker Act "(1) . . . confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and (2) . . . waives the Government's sovereign immunity for those actions." *Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005). The burden of establishing the court's subject matter jurisdiction rests with the party seeking to invoke it, *see Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002), as federal courts are presumed to lack jurisdiction unless the record affirmatively indicates to the contrary, *see Renne v. Geary,* 501 U.S. 312, 316, 111

---

7. As plaintiffs own a 50% undivided interest in the Property, their claim seeks half of this amount, or $423,192,500.00.

8. While plaintiffs do not deny that their claim accrued on the date of the OSM's Decision, plaintiffs contend that the failure of the notice

prescribed by the OSM's regulation excuses their late filing. Plaintiffs' argument that the statute of limitations was not effective as to them based on failure of notice of the OSM's decision, is distinguishable from an argument that the statute of limitations should be tolled.

S.Ct. 2331, 115 L.Ed.2d 288 (1991). When a federal court hears such a jurisdictional challenge, "its task is necessarily a limited one" because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Where a motion to dismiss "challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute." *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988) (citing *Land v. Dollar,* 330 U.S. 731, 735, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)). Hence, the court may consider all relevant evidence, including evidentiary matters outside the pleadings, when resolving a jurisdictional challenge. *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed. Cir.1985); *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583–84 (Fed.Cir. 1993). The statute of limitations in the Court of Federal Claims "is jurisdictional[ ] because filing within the six-year period was a condition of the waiver of sovereign immunity in the Tucker Act[.]" *Caguas Cent. Fed. Sav. Bank v. United States,* 215 F.3d 1304, 1310 (Fed.Cir.2000); *see also Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir.1986). The requisite showing to establish jurisdiction includes jurisdictional timeliness. *See Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1377 (Fed.Cir.1998). Thus, in the case at bar, this court may examine evidence outside the pleadings in order to resolve the disputed jurisdictional facts.

2. *Statute of limitations*

The Court of Federal Claims must first find that it possesses jurisdiction to address the merits of the case. *See Fisher,* 402 F.3d at 1172–73. The statute of limitations in the Tucker Act for the United States Court of Federal Claims requires that "[e]very claim of which the [court] has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first ac-

crues." 28 U.S.C. § 2501; *see Alliance of Descendants of Tex. Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994); *Sherwin v. United States,* 42 Fed.Cl. 672, 675 n. 2 (1999). "A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action[,]" *Alliance,* 37 F.3d at 1481, and, in the instance of a taking, when the taking occurs, *Steel Improvement & Forge Co. v. United States,* 174 Ct.Cl. 24, 29–30, 355 F.2d 627, 631 (1966); *see Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988) (stating that cause of action accrues "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence").

 Because defendant frames the issue as whether the statute of limitations should be tolled, and plaintiffs view the lynchpin as a failure of notice, the different legal determinations must be distinguished. Typically, "the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." *Martinez v. United States,* 333 F.3d 1295, 1319 (Fed.Cir.2003). This relief is not liberally granted, as a series of hurdles faces a plaintiff attempting to toll a statute of limitations. The Supreme Court of the United States has allowed equitable tolling in "situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990) (footnote omitted). The Court also cautioned that a plaintiff who fails to exercise due diligence with regard to his claim is not likely to receive a tolling of the statute. *Id.*

 This court's predecessor also has found "certain instances [where] the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim." *Japanese War Notes Claimants Ass'n v. United States,*

178 Ct.Cl. 630, 634, 373 F.2d 356, 358–59 (1967). Under these circumstances a plaintiff must demonstrate either that the defendant "concealed its acts with the result that plaintiff was unaware of their existence or . . . that [a plaintiff's] injury was 'inherently unknowable' at the accrual date." *Id.* (quoting *Urie v. Thompson,* 337 U.S. 163, 169, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)) (footnote omitted). Resolution of the issue in the present case, however, does not call for the tolling of the statute of limitations, and plaintiffs agreed at oral argument that the cause of action accrued on the date of the OSM's Decision. Tolling is not appropriate because no concealment or inappropriate conduct on behalf of the OSM has been alleged or substantiated, as contemplated by the tolling caselaw; the Decision was not inherently unknowable; and plaintiffs did not file a defective pleading during the statutory period. Where the legal doctrines diverge is that the due diligence demanded of plaintiffs to toll the statute of limitations is superseded by the mandatory notice requirement imposed upon the OSM. Plaintiffs seek to justify the late filing due to the insufficient notice provided by the OSM at the time of the Decision.

## II. *Plaintiffs' receipt of notice*

Underlying the factual disputes and the parties' discussion about the types of notice that plaintiffs may have received is a discrete inquiry. The issue is not when plaintiffs' cause of action accrued, as plaintiffs readily concede that their cause of action accrued on the date of the Decision [9] and defendant acknowledges that the statute of limitations began to run at the time plaintiffs knew or should have known about the Decision. Instead, the inquiry focuses on when plaintiffs received proper notice of the OSM's Decision as required by 30 C.F.R. § 764.19(b) (1986), which mandates that a regulatory authority send a "decision by certified mail to the petitioner and intervenors and by regular mail to all other persons involved in the proceeding." Defendant argues that, either through actual or constructive notice, plaintiffs should have been aware of the Decision

by no later than 1987. Plaintiffs, on the other hand, argue the invalidity of any notice that the OSM provided prior to 2000 because it did not satisfy the notice mandated by the agency's own regulation.

Defendant assumes that plaintiffs received sufficient notice through either the administrative process that resulted in the OSM's Decision in March 1987 or via Mr. Bagwell's receipt of letters and notices in regard to the Petition. Unfortunately, defendant fails to recognize the effect of a mandatory notice requirement, and its argument that plaintiffs were aware that "something" could happen to their Property does not satisfy the type of notice that the OSM was required to furnish. *See* Def.'s Br. filed July 9, 2004, at 14.

### 1. *The OSM's notice to plaintiffs*

The parties' arguments focus on the issue of notice and whether the OSM's actions were sufficient to provide plaintiffs with the requisite notice of the Decision. Defendant's argument places a heavy responsibility on plaintiffs-in effect requiring them to perform "due diligence" with regard to any action taken regarding their land. *See* Def.'s Br. filed May 28, 2004, at 17. In the end, however, defendant misses the mark in assuming that any notice is acceptable when the notice required by 30 C.F.R. § 764.19(b) has not been sent.

Defendant first argues that plaintiffs had actual notice of the filing of the Petition by no later than August 1985, as demonstrated by the form that plaintiffs submitted requesting a copy of the Petition in February 1985 and the August 1985 letter sent by Mr. Proctor requesting information concerning the Petition. *See* Def.'s Br. filed May 28, 2004, at 16–17. This argument would task plaintiffs with monitoring the OSM's possible actions simply because plaintiffs were aware that governmental action "might" be initiated whereby their Property "might" be affected.

Defendant then asserts that even if actual notice did not occur, plaintiffs had construc-

---

9. At oral argument plaintiffs' counsel clarified their position, and plaintiffs do not ask for a

ruling that their cause of action accrued on or about March 30, 2000.

tive notice [10] via a plethora of Federal Register publications that something was amiss: the December 1985 publication of the OSM's intent to prepare a combined draft unsuitability PED/EIS; the March 1986 publication of the availability of the Draft PED/EIS; the October 1986 publication of the availability of the Final PED/EIS; and, of course, the March 1987 publication of the OSM's Decision. Defendant also hinges its constructive notice argument on an alleged agency relationship between Mr. Bagwell and plaintiffs, thereby imputing notice to plaintiffs based on Mr. Bagwell's receipt of various notices [11] relative to the Petition.[12]

### 2. The notice that plaintiffs received

Plaintiffs' argument is easily distilled: The notice required in this matter is governed by 30 C.F.R. § 764.19(b), which requires, in part, that a regulatory authority send a "decision by certified mail to the petitioner and intervenors and by regular mail to all other persons involved in the proceeding." [13] Plaintiffs did not receive notice by certified mail, regular mail, or personal service, and the OSM's methods for attempting to notify plaintiffs of the pending Petition and subsequent Decision were inadequate.

### III. Statute of limitations and notice required

Defendant incorrectly applies the general statute of limitations standards to the present matter and ignores the essential presence of a notice requirement under 30 C.F.R. § 764.19(b). For example, defendant relies on *LaMear v. United States*, 9 Cl.Ct. 562, aff'd, 809 F.2d 789 (Fed.Cir.1986), to argue

---

10. Defendant construes language in *Hopland Band of Pomo Indians*, 855 F.2d at 1577, to permit constructive notice as an acceptable method of triggering the statute of limitations under 28 U.S.C. § 2501. Again, defendant does not acknowledge the presence of a mandatory notice requirement in the present case.

11. Interestingly, defendant imputes this notice to plaintiffs even though the notices addressed to Mr. Bagwell were in his care for MTB or Santiago Limited, neither of which has any relationship to plaintiffs' Property interest.

12. Plaintiffs have demonstrated that Mr. Bagwell was not their agent for matters of this nature. Mr. Proctor stated in his affidavit that Mr. Bagwell's scope of authority with regard to plaintiffs "was limited to collecting timber lease payments and using such payments to pay the property taxes. Joe Bagwell was not [plaintiffs'] agent for any other purposes." Proctor Aff. ¶ 7. In a September 7, 1994 letter to attorney Paul W. Sorrick, who had been advised that Mr. Bagwell represented plaintiffs regarding the Property, Mr. Bagwell informed Mr. Sorrick that "I am more or less an escrow agent for the current owners[.]" Mr. Bagwell specifically disavowed any responsibility with respect to land issues (this letter dealt with an encroachment). The context of this letter supports an inference that Mr. Bagwell's duties had been the same since at least 1987. His deposition testimony is consistent and supports the statements in this letter. *See* Bagwell Dep. at 91.

While defendant also cites to Mr. Bagwell's deposition in an attempt to create an agency relationship between Mr. Bagwell and plaintiffs, Mr. Bagwell's testimony falls short of revealing the construct of an agency relationship. Mr. Bagwell acknowledged that he communicated on behalf of plaintiffs to local authorities, such as the Health Department and Deputy Sheriff, but he stated that he did so to inquire about problems that had been brought to his attention; this presented a less than explicit picture of his relationship with plaintiffs. Defendant's further attempt to associate Mr. Bagwell with plaintiffs based on the malpractice suit against Mr. Bagwell that plaintiffs have initiated in state court, as well as a tolling agreement between Mr. Bagwell and plaintiffs concerning that suit, also fails, as such a suit or an agreement does not demonstrate Mr. Bagwell's relationship as plaintiffs' agent to receive notice. The malpractice suit is a common prophylactic. Plaintiffs merely have preserved their rights against Mr. Bagwell in the event that they do not succeed in the Court of Federal Claims. Defendant is well aware of the tactical advantage of arguing the legal consequences of facts in the alternative. *See, e.g., Eurodif S.A., Compagnie Generale Des Matieres Nucleaires v. United States*, — F.3d —, 2005 WL 486776 (Fed.Cir. Mar.3, 2005) (Government arguing that contract not subject to Contract Disputes Act ("CDA"), then taking position in another forum that same contract subject to CDA). Mr. Bagwell entered into a tolling agreement to protect his own interests. Bagwell Dep. at 75–77.

13. No demonstration has been made that plaintiffs were intervenors in this matter. The OSM's "File Folder RC 1.03," which contained all materials relating to intervenors for the Petition, contains only a letter from Mr. Proctor stating that plaintiffs wished to file an intervention. No further record of plaintiffs' intervenor status is present, and there is no demonstration that plaintiffs complied with the requirements to attain intervenor status. *See* 30 C.F.R. § 764.15(c) (1985).

that a statute of limitations is triggered when a plaintiff, through reasonable diligence, could have discovered the cause of action. In *LaMear* the court determined that plaintiff failed to use reasonable diligence to discover the presence of her action. While lack of due diligence may be a generally accepted trigger to run a statute of limitations, analogizing the facts in this case to *LaMear* fails because *LaMear* does not involve a controlling notice requirement like the one that mandates notice from the OSM.

Defendant also attempts to minimize the analogous representations cited by plaintiffs in caselaw addressing due process issues of notice by arguing that these cases involve direct condemnations of property. Nevertheless, those cases elucidate the level of acceptable notice that is comparable to the current situation. See *Schroeder v. City of New York*, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962); *United States v. 125.2 Acres of Land*, 732 F.2d 239 (1st Cir.1984).

The plaintiff in *Schroeder* claimed that she had no actual knowledge of the condemnation proceedings that led to the City of New York's acquisition of the right to divert a portion of a river. The plaintiff's summer home bordered the river, and the condemnation affected this property. The Supreme Court reiterated the general rule that an " 'elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Schroeder*, 371 U.S. at 211–12, 83 S.Ct. 279 (quoting *Mullane v. Cent. Hanover Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). In that instance the City attempted to give notice by statutorily required publication in the City Record and local newspapers, along with postings on trees and poles within a stretch of the plaintiff's property, even though plaintiff's name and address were available in deed and tax records. The Court held that this notice was insufficient because "notice by

publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question." *Id.* at 212–13.

Similarly, in *125.2 Acres of Land*, a decedent learned of the condemnation of a tract of land almost fifteen years after the proceedings. Subsequently, he filed a petition alleging that the notice of the condemnation proceedings was inadequate. The case remained undecided until years later, when the decedent's executrix requested a hearing on the original petition. The First Circuit upheld the district court's finding that the local government retained title, but it remanded on the question of just compensation because of the inadequacy of notice in relation to the initial proceedings. Similar to *Schroeder*, the decedent's name and town of residence were known. The court noted that the local government's attempts to notify the decedent, including posting one copy of the petition on an undeveloped part of the 125.2 acres of land that was not even owned by the decedent, were defective. *125.2 Acres of Land*, 732 F.2d at 242.

The review of *Schroeder* and *125.2 Acres of Land* is instructive in assessing defendant's arguments. Defendant attempts to emphasize that plaintiffs received constructive notice of the regulatory process, and that, unlike *Schroeder* and *125.2 Acres of Land*, plaintiffs' address was not ascertainable. This is an untenable argument. First, this court need not decide whether the notice given was constructive because the notice requirement for the OSM's Decision under 30 C.F.R. § 764.19(b) is mandatory, thereby rendering irrelevant the consideration of any substitute notice other than the mandated notice. Second, defendant is incorrect in arguing that the OSM did not have an address for plaintiffs at which to send notices and the Final Decision. Mr. Proctor's February 1985 submission of the OSM's form requesting a copy of the Petition provided an address. Even if, as defendant argues, this was not plaintiffs' permanent mailing address,[14] at

---

14. The court understands that it is not defendant's intention to belittle plaintiffs' given address because it is the building behind which Mr. Proctor's motor home was parked. Although this address may not have been plaintiffs' residence or place of business, it was an address that

the least the OSM could have discharged its duty by sending mailings relating to the Petition to this address. (Mr. Proctor also had included a telephone number on that form.) As plaintiffs' demonstration of jurisdiction may include proof that the OSM did not provide the mandated notice and, therefore, that plaintiffs' claim is not barred for lack of timeliness, the presence of this contact information for plaintiffs is telling.

Third, no evidence in the record suggests that the OSM attempted to consult the Recorder's Office in either Hamilton or Bledsoe Counties to obtain plaintiffs' addresses. Indeed, defendant points to the OSM's reliance on tax records, which showed that MTB was the listed owner of the Property, to constitute an attempt to ascertain the owners of land affected by the Petition. At argument defendant introduced the relevant state statutes requiring that a property owner list his address. *See* Tenn.Code Ann. § 67–5–2502(a), (b) (West 2004) (stating requirements for notice of sale of land, including requirement to register owner's name and address with assessor of property in given county); *id.* § 67–5–804(a) (listing information that tax assessors shall keep for purposes of assessment of real property with regard to identification and registration of mineral interests, including name of true owner(s), if known).[15] Tax records, however, are maintained for fiscal purposes, which include a state's interest in collecting property taxes and imposing liens. The purpose of recordation of deeds in the Recorder's Office is to definitize the ownership of real property. Conceivably, a property owner could fail to register for tax purposes, yet still appear as the record owner of real property. The consequence would be the imposition of a tax lien, not a forfeiture of a property right. The state's interest in identifying the respon-

sible party for tax notices is manifested in these statutes. Record ownership, in contrast, has significant consequences beyond tax assessments. Among the most obvious is providing base data for title and boundary disputes. Defendant also resists the notion that the OSM was required to conduct a title search to determine ownership of plaintiffs' Property.[16] Attempting to find the name of the record owner would constitute a reasonable effort to obtain the name and address of a property owner. The OSM made no such effort. Moreover, the OSM could have directed mailing of the OSM Decision to the address that plaintiffs had provided, but did not do so. Certainly, the interests of the United States Government in fostering conservation of natural resources do not overcome a property owner's constitutionally protected interest to respond to efforts to impair the exercise his rights of ownership.

Finally, defendant's argument that plaintiffs should have known of the Decision, or that a Decision was possible, because plaintiffs asked for a copy of the Petition is not justifiable. Defendant's argument would nullify the OSM's obligation to provide mail notice to an interested party if a landowner identified himself as an interested party; in essence, defendant would subvert the notice requirement if an interested party had identified itself.

The crux of the matter comes down to this: No evidence exists that the OSM mailed, via either certified or regular mail, a copy of the Decision to plaintiffs. In fact, Mr. Siddell testified at his deposition that his review of the OSM's file revealed no evidence that the OSM's Decision was sent to plaintiffs by regular mail or that plaintiffs were personally served with notice. Siddell Dep. at 113–14. Moreover, no mailing list used by the OSM for mailings associated with the Peti-

---

they provided. By providing their address, plaintiffs were aware that they could receive mail at that address and that they should look for mailings addressed to them. Certainly defendant does not suggest that a motor home, or a building in front of a motor home, remits a lesser standard of notice than a more fixed property structure.

15. Defense counsel proffered these statutes in their current form at oral argument.

16. While plaintiffs, as defendant points out, should have corrected any misinformation in the tax records, it cannot be found that it was plaintiffs' intent to mislead individuals researching tax records into believing that MTB was the owner of the Property. Defendant misses the point that the OSM failed to properly check with the Recorder's Office for the ownership records concerning the Property.

tion includes a listing for plaintiffs. Instead, defendant attempts to argue that Mr. Bagwell received notice on behalf of plaintiffs in his capacity as agent for MTB and Santiago Limited, two corporate entities with which plaintiffs have no relationship. Finally, as Mr. Bagwell was not deemed plaintiffs' agent for these matters, all arguments made by defendant imputing notice to plaintiffs by way of Mr. Bagwell's receipt of information pertinent to the Petition cannot succeed.

Defendant complains that accepting plaintiffs' argument would stand on its head the rule that, in order to establish subject matter jurisdiction, a plaintiff must show that suit has been filed within the applicable statute of limitations. The court has held plaintiffs to their burden. They rest on a regulation that commands the government entity to mail notice. The OSM cannot show that notice was mailed to plaintiffs' last address of which the OSM knew or the address listed for the property owners in the Recorder's Office.

It is apparent that plaintiffs overcome defendant's motion to dismiss on a technicality. When weighing the constitutional interests of plaintiffs, and what amounts to a possible loss of over $400 million, against the environmental interests that have thus far been protected by the OSM's Decision, however, plaintiffs are entitled the opportunity to continue pursuing their Fifth Amendment rights. Having a governmental agency comply with its own regulation is a minimal burden, and one which the evidence shows the OSM did not discharge in this matter.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion is denied.

2. A scheduling order has been entered separately.

---

1. This order originally entered on February 24, 2005, and is being reissued for publication at plaintiff's request.